714 So.2d 901 (1998)
Ruby Lynn WEBB, Plaintiff-Appellee,
v.
LAGNIAPPE HOSPITAL CORPORATION, Defendant-Appellant.
No. 30659-CA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1998.
Rehearing Denied August 13, 1998.
*902 Rick Fayard, for Defendant-Appellant.
Elton B. Richey, Jr., Shreveport, for Plaintiff-Appellee.
Before BROWN, WILLIAMS and GASKINS, JJ.
GASKINS, Judge.
Lagniappe Hospital Corporation appeals from an adverse judgment enforcing an employment termination agreement in favor of its former employee, Ruby Lynn Webb. Ms. Webb answered the appeal, seeking increased damages. For the reasons set forth below, we affirm the trial court judgment.

FACTS
The plaintiff, Ruby Lynn Webb, began her employment as marketing director of Lagniappe Hospital, a long-term acute care facility, in November 1993. Following an interview, she was hired by the hospital administrator and chief executive officer (CEO), Lee McLendon. She was recommended to him for the position by Dr. Shah, the medical director of Lagniappe's rehabilitation unit.
In conjunction with her hiring, Ms. Webb signed an application which contained an express statement that she understood that "no employment contract is being offered or implied." It also specified that "employment within this organization may be terminated at any time by either employer or employee." The terms of her employment included an annual salary of $60,000, a standard hospital benefit package, health insurance beginning the date of employment, and a pager and car phone.
In late June or early July of 1994, J.L. Carraway, the president and sole stockholder of the hospital, became displeased with the performance of Ms. Webb and her department. Although Mr. Carraway wished to "clean house" of the entire marketing department, Mr. McLendon persuaded him to give Ms. Webb an opportunity to improve her department's performance during the next 30 days. However, within less than three weeks, Mr. McLendon had concluded that the pressure placed upon Ms. Webb by Mr. Carraway was making her totally ineffective and affecting her entire department. Convinced that Ms. Webb's relationship with the hospital in generaland Mr. Carraway in particularwas unsalvageable, Mr. McLendon decided to terminate Ms. Webb's employment with Lagniappe immediately. To facilitate her removal while doing the least damage to the hospital and to Ms. Webb, Mr. McLendon proposed a severance agreement. In particular, he wished to avoid antagonizing Dr. Shah, the plaintiff's mentor and a key physician at the facility. Additionally, Mr. McLendon wished to retain Ms. Webb's good will, as she had "insider" knowledge pertaining to the hospital, and he hoped *903 to avoid the possibility of wrongful termination litigation. The termination agreement would also secure immediate vacancy of the marketing director position.
Consequently, on July 20, 1994, Ms. Webb was offered an employment severance package which called for her to tender her resignation, effective October 21, 1994. She would not actually work for Lagniappe from July 21 to October 21, but would continue to receive her monthly salary of $5,000 for this three-month period.[1] She would also continue to receive her other benefits, including medical insurance. She accepted on July 21, 1994, and the agreement was reduced to writing in a letter from Mr. McLendon dated July 22, 1994.
On or about August 6, 1994, while signing paychecks, Mr. Carraway discovered a check for Ms. Webb. He reprimanded Mr. McLendon and ordered him to immediately terminate the agreement with Ms. Webb.[2] Mr. McLendon sent Ms. Webb a letter dated August 6, 1994 in which he stated the following:
One of the realities of life is that change is constant. Because of this reality, I can not continue to honor the agreement we had when you left Lagniappe. It is necessary to limit the agreement to thirty days plus accrued vacation time. Therefore, the enclosed check represents your final check from Lagniappe. Of course, other benefits lapse at the same time.
Included with the letter was a check for $1,884.49.
On October 3, 1994, the plaintiff made amicable demand upon Lagniappe through counsel. Although Lagniappe reinstated her health insurance and medical benefits through October 21, 1994, it refused to pay the remaining compensation. Thereafter, Ms. Webb brought the instant suit against Lagniappe seeking damages for breach of their contractual termination agreement. She also sought penalties under La. R.S. 23:631 and 23:632, as well as attorney fees under La. R.S. 23:632. On two occasions, the trial court ruled that she presented no cause of action because Louisiana is an "at will" employment state and, consequently, she could have been fired at any time. However, in October 1996, this court reversed in an unpublished opinion. Finding that she had, in fact, stated a cause of action, we remanded the matter for further proceedings.
Following a bench trial, the trial court found that Ms. Webb and Lagniappe, acting through Mr. McLendon, entered into a binding severance agreement on July 22, 1994; that Mr. McLendon had the authority to enter into the agreement on the corporation's behalf; that the terms of the agreement called for her to tender her resignation effective October 21, 1994, in exchange for which Lagniappe would continue to pay her monthly salary of $5,000, together with health and life insurance premiums; and that Lagniappe failed to comply with the agreement by failing to pay her monthly salary from August 21, 1994 to October 21, 1994. (The trial court also found that Ms. Webb was an "at will" employee and there was no binding employment contract between the parties.) The court awarded damages of $10,000 to the plaintiff under the terms of the employment severance agreement. However, it denied recovery for any other benefits lost through the breach because the evidence failed to establish the amount owed. Finding La.R.S. 23:631 and 23:632 inapplicable, the trial court also denied attorney fees and penalties.
Lagniappe appeals, contending that the trial court erred in finding that there was a binding termination agreement. Additionally, Ms. Webb answered the appeal, seeking an increase of $932.68 for accrued vacation time, as well as penalties of $15,000 and reasonable attorney fees under La. R.S. 23:631 and 23:632.

TERMINATION AGREEMENT
Lagniappe argues that the trial court erred in finding that a valid contract existed between it and the plaintiff. Specifically, it *904 contends that Mr. McLendon lacked authority to bind the corporation and that the termination agreement was a gratuitous contract without a lawful cause.

McLendon's authority
The trial court found that Mr. McLendon had authority to act on behalf of the defendant corporation when he entered into the termination agreement with Ms. Webb. Determinations of an agency relationship and the scope of authority are essentially factual matters, subject to the manifest error standard of review. Salley v. Colonial Marine Industries, Inc., 95-2215 (La.App. 4th Cir. 9/11/96), 680 So.2d 1242. It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
After a careful review of the record, we find that the evidence fully supports the trial court's conclusion that Mr. McLendon had the authority to enter into a severance or termination agreement with the plaintiff. As administrator and CEO of the hospital, Mr. McLendon had the power to hire and fire employees. Entering into termination agreements with employees was certainly included within this authority, and he had done so on prior occasions without incident.[3] He initiated the termination agreement as a means to benefit both the hospital and Ms. Webb. Although Mr. McLendon's authority over financial matters was eventually curtailed by a board resolution, this did not occur until after he entered into the termination agreement with Ms. Webb.
Even assuming arguendo that the trial court erred in finding actual authority, this record would certainly support a finding that Mr. McLendon possessed the apparent authority to act on behalf of Lagniappe in a personnel matter. See Tedesco v. Gentry Development, Inc., 540 So.2d 960 (La.1989).

Lawful cause
Lagniappe contends that the termination agreement was invalid because it was a gratuitous contract under La. C.C. art.1910 executed without requisite formalities. It also asserts that the contract lacked lawful cause as required by La. C.C. art.1966.
An obligation cannot exist without a lawful cause. La. C.C. art.1966. Cause is the reason why a party obligates himself. La. C.C. art.1967. Civilian "cause" is not common law "consideration." Comment (c), La. C.C. art. 1967. The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy. La. C.C. art.1968. An obligation may be valid even though its cause is not expressed. La. C.C. art.1969. Thus, there is a presumption that a cause is present in an obligation. See Litvinoff, Still Another Look at Cause, 48 La.L.R. 3 (1987).
A contract is gratuitous when one party obligates himself toward another for the benefit of the latter, without obtaining any advantage in return. La. C.C. art.1910. A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. La. C.C. art. 1967. Reliance on a gratuitous promise made without required formalities is not reasonable. La. C.C. art.1967.
In his testimony, Mr. McLendon set forth several reasons for obligating the hospital to a generous severance package with Ms. Webb. Foremost, he wished to maintain a good relationship with Ms. Webb's mentor, Dr. Shah. Mr. McLendon testified that it was important to him to be able to represent to Dr. Shah, a vital member of Lagniappe's staff, that, even though Ms. Webb's employment had not worked out, her protege had been fairly treated. He also wished to maintain Ms. Webb's good will toward Lagniappe. As marketing director, Ms. Webb had been *905 privy to confidential insider information. Mr. McLendon was concerned that she might go to work for a competitor and use that knowledge against them if embittered by her treatment at Lagniappe. He hoped that by treating Ms. Webb in the most positive way possible, he would ensure her continuing good will toward Lagniappe and lessen this possibility. Mr. McLendon also had some concerns that Ms. Webb's termination might result in litigation; by treating her in what he perceived to be a fair manner, he was attempting to defuse this possibility.[4]
We find that these reasons amount to sufficient cause to support the termination agreement. Also, we do not believe that the contract can be accurately described as gratuitous; clearly Mr. McLendon was attempting to obtain an advantage for Lagniappe in return. Contrary to Lagniappe's argument, we find nothing against public policy in this agreement.

ACCRUED VACATION TIME
In her answer to the appeal, the plaintiff complains that the trial court erred in not awarding her compensation for accrued vacation time. However, an examination of the record reveals that the evidence on this issue was, at best, vague. In particular, Ms. Webb could not testify with any certainty as to the amount of vacation time which she had taken before she left her employment with Lagniappe. Inasmuch as the plaintiff failed to carry her burden of proof on this matter, we find that the trial court did not err in declining to make an award of compensation for accrued vacation time.

PENALTIES AND ATTORNEY FEES
The provisions of La. R.S. 23:631 in effect at the time the plaintiff left Lagniappe's employment provided that upon the discharge or resignation of an employee, her employer was obliged "to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, not later than three days following the date of discharge or resignation."[5]
La. R.S. 23:632 states:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
La. R.S. 23:631 and 23:632 are designed to compel prompt payment of wages upon an employee's discharge or resignation. Being penal in nature, these statutes are strictly construed. Boudreaux v. Hamilton Medical Group, Inc., 94-0879 (La.10/17/94), 644 So.2d 619.
These statutes refer to payment of "wages," specifically "the amount then due under the terms of employment." The termination agreement between Ms. Web and Lagniappe does not concern "wages" as set forth in these strictly construed statutes. See Boudreaux v. Hamilton Medical Group, Inc., supra; Miller v. Louisiana Casino Cruises, Inc., 96-0493 (La.App. 1st Cir. 12/20/96), 688 So.2d 599, writ denied, 97-0870 (La.5/9/97), 693 So.2d 765. Therefore, the *906 penalty statutes are inapplicable to the instant case. The trial court did not err in denying the plaintiff an award of penalties and attorney fees under La. R.S. 23:631 and 23:632.

CONCLUSION
The judgment of the trial court is affirmed. Costs are assessed against the defendant, Lagniappe Hospital Corporation.
AFFIRMED.

APPLICATION FOR REHEARING
Before HIGHTOWER, BROWN, WILLIAMS, GASKINS and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] In the past, Mr. McLendon had offered similar termination agreements to other employees.
[2] Mr. Carraway subsequently fired Mr. McLendon as administrator and CEO, partially due to his displeasure over the termination agreement Mr. McLendon gave to Ms. Webb.
[3] Mr. McLendon testified that Mr. Carraway was "well aware" of these prior severance packages and had raised no objections to them. However, Mr. Carraway denied learning of these other agreements until after he discovered the one involving the plaintiff. The trial court apparently resolved this conflict in testimony in favor of Mr. McLendon.
[4] Although Ms. Webb was actually employed at will, she was under the mistaken impression that she could not be fired except for cause. Also, Mr. McLendon was acting to end her employment with Lagniappe before the expiration of the 30-day grace period she had been given to rectify the problems in her department. Thus, regardless of their ultimate legal merit, there was at least the potentiality of litigation resulting from her termination. Had the termination agreement not been breached at Mr. Carraway's instruction, it is likely that Mr. McLendon's efforts to avoid litigation would have been successful.
[5] The statute was amended by Acts 1995, No. 325; among other changes, the time period for paying an employee who resigned was altered.